IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF NEW YORK

```
GARY RENELIQUE,                )
                               )
             Plaintiff,        )         9:03CV1256
                               )
        v.                     )
                               )
GEORGE B. DUNCAN, et al,       )         MEMORANDUM OPINION
                               )
             Defendants.       )
_____)
```

        This matter is before the Court on defendants' motion
for summary judgment (Filing No. 69).  Plaintiff did not respond.
The Court has reviewed the motion, defendants' statement of
material facts, evidentiary submissions and defendants'
supporting brief and finds that defendants' motion for summary
judgment should be granted.

## I.  Standards

### A.  Summary Judgment

        On a motion for summary judgment, all reasonable
factual inferences must be drawn in favor of the non-moving
party.  See, e.g., *Savino v. City of New York*, 331 F.3d 63, 71
(2d Cir. 2003)(citing *Anderson v. Liberty Lobby,* 477 U.S. 242,
255 (1986)).  However, to survive a motion for summary judgment,
"the nonmoving party must come forward with 'specific facts
showing that there is a genuine issue for trial.'"  *Matsushita
Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587

(1986)(emphasis omitted)(quoting *Fed. R. Civ. P. 56(e)*)(citation omitted).  "Conclusory allegations, conjecture, and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998)(citation omitted).  Thus, "statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar* Coll., 196 F.3d 435, 452 (2d Cir. 1999)(citations omitted).

"In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy [its] burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." *Vann v. City of New York,* 72 F.3d 1040, 1048 (2d Cir. 1995) (*citing Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986)). A party "moving for summary judgment must prevail if the [non-movant] fails to come forward with enough evidence to create a genuine factual issue to be tried with respect to an element essential to its case." *Allen v. Cuomo,* 100 F.3d 253, 258 (2d Cir. 1996)(*citing Anderson,* 477 U.S. at 247-48).  While the submissions of pro se litigants are liberally construed, see, e.g., *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir. 1994), the fact that the plaintiff is "proceeding pro se does not otherwise relieve [him] from the usual requirements of summary judgment."

*Fitzpatrick v. New York Cornell Hosp.,* 2002 U.S. Dist. LEXIS 25166, 2003 WL 102853, at *5 (S.D.N.Y. Jan. 9, 2003)(citing cases).

**B.   Exhaustion of Administrative Remedies**

The Prison Litigation Reform Act of 1995 states: "No action shall be brought with respect to prison conditions under section 1979 of the Revised Statutes of the United States (42 U.S.C. 1983), or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  The Supreme Court has held that the administrative exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  *Porter v. Nussle*, 534 U.S. 516, 532 (2002).  The exhaustion requirement is a prerequisite to all prisoner claims, even if the requested remedy is unavailable in an administrative grievance proceeding.  *Porter*, 534 U.S. at 524 (*citing Booth v. Churner*, 532 U.S. 731, 740-41 (2001)).  This requirement exists in order "to reduce the quantity and improve the quality of prisoner suits . . . [and to afford] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case."  *Id*. at 524-25.

-3-

The failure to exhaust administrative remedies is an affirmative defense that may be waived, *Johnson v. Testman*, 380 F.3d 691, 695 (2d Cir. 2004), and is subject to estoppel. *Ziemba v. Wezner*, 366 F.3d 161, 163 (2d Cir. 2004). Where defendants have raised the issue of administrative exhaustion as an affirmative defense and plaintiff has plausibly countered that assertion, the court must conduct a three-step inquiry. *Hemphill v. New York*, 380 F.3d 680, 686 (2d Cir. 2004). First, the court must ask whether administrative remedies were in fact "available" to the prisoner. *Hemphill*, 380 F.3d at 686 (*citing Abney v. McGinnis*, 380 F.3d 663 (2d Cir. 2004)). Second, the court must determine whether defendants forfeited the defense of administrative exhaustion by failing to raise or preserve it, *id*. (*citing Johnson*, 380 F.3d 691), or whether defendants are estopped to raise the defense by their own actions inhibiting the inmate's exhaustion of remedies. *Id*. (*citing Ziemba*, 366 F.3d at 163). Third, the court must inquire whether the prisoner has alleged "special circumstances" that justify his failure to exhaust administrative remedies. *Id*. (*citing Giano v. Goord*, 380 F.3d 670 (2d Cir. 2004)).

Under the New York Department of Corrections' well-established inmate grievance procedure, an inmate has fourteen days from the date of the incident complained of to file a complaint, but "mitigating circumstances" may toll the deadline.

## II.  Plaintiff's Claims

Plaintiff's amended complaint identifies twenty-eight (28) defendants and then sets forth six causes of action which consist of thirty-five (35) numbered paragraphs which are arbitrarily divided into the six claims in a seemingly random and incoherent way.  "This is a civil rights action alleging discrimination under the American Disability Act, asault (sic) and battery, deprivation of medical treatment, retaliation for filing grievance complaints, and cruel and unusual treatment." He also makes claims about denial of due process.

## III.  Facts

The following facts were derived mainly from the Defendants' Statement of Material Facts, submitted in accordance with N.D.N.Y.L.R. 7.1, which were not specifically countered nor opposed by plaintiff.  *See* N.D.N.Y.L.R. 7.1(a)(3)("Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party." Plaintiff Gary Renelique ("plaintiff") has not filed any response.  Therefore, under this Court's local rules, all facts set forth by defendants are deemed admitted.

**Facts Related to Plaintiff's Claims Against Defendants Novello, Williams, Paolano and Shimkunas**

Defendant Novello is the Commissioner of the New York State Department of Health.  Plaintiff's only claim against Novello is that he wrote to her to investigate whether the

-5-

licenses of the medical and mental health staff at Great Meadow
were still valid and that his letters were ignored (AC, ¶ 16;
Transcript of Deposition of Plaintiff Gary Renelique ("Renelique
Dep."), 42:19-43:20 (attached as Exhibit J to Holohan Affirm.)
(Filing Nos. 69-24, 69-25).

　　　　Plaintiff alleges that on October 2, October 6 and
October 17, 2002, plaintiff requested that Lieutenant Williams
("Williams") investigate his complaints of misconduct by officers
(AC, ¶ 17).  At his deposition, plaintiff testified that he made
both verbal and written complaints to Williams about not being
allowed to attend callouts but that Williams ignored his requests
for an investigation (Renelique Dep. 99:4-100:11).

　　　　Plaintiff alleges "Defendant Paolano despite knowing
the Plaintiff [sic] medical records stated that plaintiff should
not be place [sic] in facility who [sic] has steps because of
plaintiff disability" (AC, ¶ 9).  Plaintiff's medical records,
demonstrate that he was examined and treated by Dr. Silverberg,
not Dr. Paolano.  See Silverberg Aff., Ex. A (Filing No. 69-39);
Paolano Aff. ¶ 3 (Filing No. 69-36).  Thus, plaintiff is suing
Dr. Paolano merely because of his position as Medical Director at
Great Meadow.

　　　　Plaintiff alleges that on August 15, August 31, and
October 23, 2002, he complained to defendant Shimkunas, the Chief
of the Mental Health Unit at Great Meadow, regarding Wurzberger,

-6-

Kim and Rawson (AC, ¶ 13).  Plaintiff alleges that Shimkunas
failed to supervise these employees, who refused to see him for
his serious mental health problems (Renelique Dep. 126:17-
127:11).  At his deposition, plaintiff testified that he wrote
letters to defendant Shimkunas, but that Shimkunas ignored his
letters (Renelique Dep. 127:5-11).

**Facts Related to Plaintiff's Claim Against Defendant Carpenter**

Plaintiff alleges that defendant Carpenter refused him
advanced legal copies despite knowing that plaintiff had a court
deadline (AC, ¶ 11).  At his deposition, plaintiff testified that
in August 2002, he "needed about 400 or 500 copies" to respond to
interrogatories served by Assistant Attorney General Patrick
McRae in *Renelique v. Holloway*, 01-CV-0601 (N.D.N.Y.)(Renelique
Dep. 15:1-6).  Under DOCS Directive 4833, an inmate can receive
advance photocopies for legal documents where he has insufficient
funds in his account and the specific document is required by
the court.  See Carpenter Aff., ¶ 6 (Filing No. 69-31) and Ex. A
(Filing No. 69-32).  Given the vast number of documents included
in plaintiff's request, defendant Carpenter required plaintiff to
provide documentation that each specific document was required by
the courts (Carpenter Aff.,
¶ 7).  Thus, defendant Carpenter did not deny plaintiff's request
in an effort to prejudice plaintiff's litigation, but rather, to
ensure compliance with DOCS Directives.  *Id*. at ¶ 7.  Moreover, a

review of the docket in *Renelique v. Holloway*, 01-CV-0601 (N.D.N.Y.) demonstrates that in August 2002, plaintiff requested and was granted an extension until September 19, 2002, to respond to defendants' discovery requests.  See Filing No. 49.  Further, plaintiff testified at his deposition that he was eventually able to pay for photocopies and to respond to defendants' discovery requests (Renelique Dep. 14:10-15).  Finally, a review of the docket in *Renelique v. Holloway* demonstrates that the action is trial ready.  *Renelique v. Holloway*, 01-CV-0601, Filing No. 78. Thus, plaintiff has not suffered any injury as a result of Carpenter's denial of his request for advanced copies.

**Facts Related to Plaintiff's Claims Against Rawson**

Plaintiff alleges that on September 9 and 27, 2002, defendant Rawson refused to provide him with documents that were important to pending litigation in the U.S. District Court for the Southern District of New York (AC, ¶ 15).  At his deposition, plaintiff elaborated on his claims against Rawson and testified that she informed plaintiff that he needed to request copies of his mental health records from the Director of the Mental Health Unit at Great Meadow (Renelique Dep. 17:2-14).  Plaintiff testified that he made such a request which the Director then denied (*Id*. at 17:15-18).  Plaintiff then filed a grievance and the records were ultimately turned over to him, and he was able to submit the records to the court (*Id*. at 17:19-18:5).  The

-8-

action was still pending at the time of plaintiff's deposition (*Id.* at 18:9-10).

**Facts Related to Plaintiff's Claims Against Celeste and Vedder**

Plaintiff alleges that on May 8 and 15, 2003, defendant Celeste refused to open his cell door, preventing him from going to the law library (AC, ¶ 33). Plaintiff alleges that on four occasions, he tried to complain about "those" officers, but that defendant Vedder failed to initiate an inquiry into their misconduct (AC, ¶ 30). At his deposition, plaintiff specified that he tried to complain to defendant Vedder that the officers (apparently this includes Celeste) were not opening his cell door so he was not able to go to the law library, but that Vedder refused to stop and talk with him (Renelique Dep. 110:9-111:18). Plaintiff does not identify any injury as a result of his inability to go to the law library.

**Facts Related to Plaintiff's Claim Against Reams**

The only allegation in the amended complaint against defendant Sally Reams is that on July 18, 2002, and March 26, 2003, she refused to accept plaintiff's grievance (AC, ¶ 28). At his deposition, plaintiff quantified his allegation by testifying that defendant Reams refused to accept about 10 to 15 of his grievances (Renelique Dep. 106:22-107:15).

**Facts Related to Plaintiff's Claim Against Kelly**

The only claim in the complaint against defendant Captain Kelly alleges that on May 10, 2003, Captain Kelly threatened plaintiff (AC, ¶ 32).  At his deposition, plaintiff testified that after Captain Kelly learned plaintiff wrote letters to Commissioner Goord and others in Albany regarding events at Great Meadow, Captain Kelly called him into his office and told plaintiff that if he was having problems at Great Meadow, he should first bring them to Captain Kelly's attention (Renelique Dep. 112:24-113:9).  Plaintiff further testified that Captain Kelly called him a cry baby and told plaintiff he did not want people outside Great Meadow knowing what goes on inside Great Meadow (*Id*. at 113:24-114:4).

**Facts Related to Plaintiff's Claim Against Potter**

Plaintiff alleges that on April 1, 2003, defendant Potter denied his claims dated March 18, 2003, even though plaintiff had a receipt for the property in question (AC, ¶ 29). At his deposition, plaintiff clarified this claim, testifying that defendant Potter denied his property claim (Renelique Dep. 49:5-50:12).

**Facts Related to Plaintiff's Claim Against Bundrick**

Plaintiff alleges that on October 17, 2002, defendant Bundrick, the Nurse Administrator at Great Meadow, kicked him in the lower back and stepped on plaintiff's right hand and wrist

(AC, ¶ 10).   Plaintiff never made these allegations before filing this action.   See Bundrick Decl., ¶ 2 (Filing No. 69-42). Plaintiff was seen by the medical staff on October 17, 2002, for complaints of chest pain.   See Bundrick Decl., ¶¶ 3-5; see also Silverberg Aff., Ex. A, pp. 9-10.   Once plaintiff was informed he was not having a heart attack, he informed defendant Bundrick that the real reason he wanted to see the medical staff was because he wanted a "feed in cell" order (Bundrick Decl., ¶ 6). Bundrick informed plaintiff this was not a proper use of emergency sick call.   *Id*.   Plaintiff then "fell down" and began shaking violently.   *Id*. at ¶ 7.   This activity ceased with the application of an ammonia inhalant.   *Id*.   Plaintiff was again warned about the proper use of emergency sick call and left the clinic without further incident.   *Id*. at ¶ 9.

When plaintiff filed a grievance regarding his medical care on October 17, 2002, he never alleged that he was assaulted by Bundrick.   Holohan Affirm., Ex. B (Filing No. 69-16). Specifically, he complained that the nurses were laughing at him and that Bundrick refused to issue him a "feed in cell" order. *Id*.   Nowhere in his October 17, 2002, grievance or his January 2, 2003, appeal statement did plaintiff allege any use of force. *Id*.   Plaintiff was seen by the medical staff just one day later, October 18, 2002, and complained about injuries he sustained from a fall.   Silverberg Aff., Ex. A, p. 10.

**Facts Related to Plaintiff's Claims Against Poirier, Pomainville, Weeks, Wolford, Perry and Armstrong**

On March 14, 2003, CO Weeks searched inmate Renelique's cell looking for stolen law library supplies. Holohan Affirm., Ex. F (Filing No. 69-20). As a result of the search, several items of contraband were confiscated including highlighters, pens and a bottle of white-out. *Id*. Plaintiff was keeplocked and issued a misbehavior report ("MR") charging him with theft of property. *Id*. Plaintiff was issued the MR by CO Weeks. *Id*. CO Pomainville signed the MR as a witness. *Id*.

On March 18, 2003, a Tier II hearing was conducted by Lieutenant Armstrong. Holohan Affirm., Ex. G (Filing No. 69-21). During the hearing, plaintiff never testified that he was assaulted. *Id*. Plaintiff never even mentioned Wolford or Perry by name. *Id*. Rather, plaintiff's defense was that he arrived at Great Meadow with the property. *Id*. at p. 2. Lieutenant Armstrong accepted the defense with respect to the highlighters and pens because plaintiff's transfer records reflected he was in possession of such items. *Id*. at p. 3. However, the transfer form made no reference to the bottle of white-out. *Id*. Therefore, plaintiff tried to argue that the white-out only had water in it. *Id*. at p. 4.

Lieutenant Armstrong, who was capable of observing the contents of the bottle, rejected this defense noting that the

bottle contained white-out.  *Id*. at p. 5.  At the conclusion of
the hearing, plaintiff was found guilty and sentenced to time
served in keeplock (4 days).  Holohan Affirm., Ex. F (Filing No.
69-20).  Plaintiff appealed the guilty disposition to the
Superintendent's Office.  *Id*.  In his appeal statement, plaintiff
alleged that defendants Poirier, Weeks, Pomainville and Armstrong
were falsely accusing him of stealing property because they are
racists.  *Id*.  Plaintiff never mentioned an alleged assault and
never mentioned Perry or Wolford.  *Id*.

On that same day, March 18, 2004, plaintiff also filed
a grievance alleging that defendants Poirier, Weeks, Pomainville
and Armstrong were falsely accusing him of stealing property, but
never mentioned an alleged assault.  Holohan Affirm., Ex. C
(Filing No. 69-17).  Plaintiff's grievance never mentioned Perry
or Wolford.  *Id*.

Two days later, on March 20, 2003, plaintiff was seen
by the medical staff.  Silverberg Aff., Ex. A, p. 21.  He sought
pain medication in association with complaints of right elbow and
left finger pain which he said started on March 6, 2003 -- eight
days before the alleged assault.  *Id*.  It is not until two months
later, when plaintiff wrote a letter to the Inspector General's
Office, that he alleges he was assaulted on March 14, 2003.  See
Holohan Affirm., Ex. H (Filing No. 69-22).  Like all plaintiff's

written statements prior to this action, plaintiff never alleged that Perry or Wolford assaulted him.  *Id.*

**Facts Related to Plaintiff's Claim Against Roy**

Plaintiff wrote a letter to the Inspector General's Office complaining that he was assaulted at Great Meadow Correctional Facility.  *Id.*  While his complaint letter was received by the Inspector General's Office, there is no indication that the Inspector General himself, reviewed the complaint or was involved in the investigation.  A thorough investigation was completed by Investigator Vacca.  *Id.* Investigator Vacca concluded that plaintiff's claims of excessive force were unsubstantiated for the same reasons discussed above. *Id.*  Nothing in the record suggests that the complaint investigation was inadequate or was incompetently performed.  *Id.*

**Facts Related to Plaintiff's Claims Against Silverberg, Nunez and Nesmith**

While plaintiff was at Great Meadow, he was seen by the medical staff at least seventy times.  Silverberg Aff., ¶ 3 (Filing No. 69-38).  Plaintiff was also seen five times by Dr. Silverberg and once by Dr. Nunez.  *Id.*, Ex. A, p. 1, 2, 11, 18, 22, 26; see also Nunez Decl., ¶ 4 (Filing No. 69-41).  Both doctors examined plaintiff and noted his bizarre gait and verbal tic.  Silverberg Aff., ¶¶ 6, 7; Nunez Decl., ¶ 5.  Both doctors concluded that most of plaintiff's physical complaints were the

-14-

manifestation of a mental illness.  Silverberg Aff., ¶ 21, Ex. A,
p. 2, 22; Nunez Decl., ¶ 8.  Other than plaintiff's Hepatitis C
and chronic lower back pain, neither doctor found any medical
causes for plaintiff's litany of complaints.  Silverberg Aff.,
¶¶ 5, 10, 13, 14, 18, 20; see also Nunez Decl., ¶¶ 6, 8.  For
example, plaintiff complained of head trauma and seizures but
recent MRI and EEG tests were normal.  Silverberg Aff., ¶ 10.
Similarly, plaintiff complained of decreased hearing in his left
ear but an outside audiology consult did not reveal any hearing
loss.  *Id*. at ¶ 16; Ex. A, p. 25.

     With respect to plaintiff's Hepatitis C, plaintiff's
liver functions were monitored every four months.  Silverberg
Aff., ¶ 9.  Plaintiff's disease was mild and did not warrant
immediate treatment.  *Id*. at ¶ 9; Nunez Decl., ¶ 8.  With respect
to plaintiff's lower back pain, Dr. Silverberg issued a permit
for a back brace, which plaintiff was provided on February 26,
2003.  Silverberg Decl., ¶ 15.

     Plaintiff was also treated by the Physician Assistant
Ted Nesmith.  Specifically, on September 23, 2002, plaintiff
complained of left thumb pain from a fall from his bed.  Nesmith
Aff. ¶ 8 (Filing No. 69-40).  Plaintiff was not in acute distress
and x-rays were ordered.  *Id*.  An initial reading of the x-rays
was negative.  *Id*.  When plaintiff continued to complain of pain
for approximately one week, a re-examination revealed that he was

not in acute or apparent distress, and there was no tenderness,
swelling or bruising.  *Id*. at ¶ 10.  In light of the lack of
physical findings, plaintiff was treated with elevation.  *Id*.
Plaintiff did not report any further pain or discomfort to the
medical staff.  *Id*. at ¶ 11.

On June 2, 2003, PA Nesmith treated plaintiff for
complaints of indigestion and dry skin.  *Id*. at ¶ 12.  With
respect to the indigestion, PA Nesmith prescribed Prevacid.  *Id*.
With respect to the dry skin, no dry skin was observed, thus no
treatment was warranted.  *Id*.

On July 8, 2003, PA Nesmith treated plaintiff for
complaints of a vague lump just above his belly button.  *Id*. at
¶ 5.  Upon examination, plaintiff's abdomen was soft, non-tender
and there was no lump seen or felt.  *Id*.  In light of no physical
findings, PA Nesmith determined that observation was the best
course of treatment.  *Id*.  Other than repeating his complaint to
a nurse two days later, there is no record of plaintiff
complaining about this lump again.  *Id*. at ¶ 6.

**Facts Related to Plaintiff's Claims Against Wurzberger and Kim**

During plaintiff's incarceration at Great Meadow from
July 2002 to July 2003, his mental health providers were Dr.
Wurzberger and Ms. Kim, a social worker.  See generally,
Wurzberger Aff. (Filing No. 69-37) and Kim Decl (Filing No. 69-
43).  Prior to plaintiff arriving at Great Meadow, it had been

-16-

determined that he could benefit from the services of the Mental
Health Units at various facilities.  Wurzberger Aff., ¶ 4.  In
fact, prior to his arrival at Great Meadow, OMH staff designated
plaintiff as an OMH Level 1.  Kim Decl., ¶ 3.  An OMH Level 1 is
the highest level assigned to inmates by OMH.  *Id*.  This
designation may have been the impetus for plaintiff's transfer to
Great Meadow, which has the capability to treat inmates with an
OMH Level 1.  *Id*. at ¶ 5.

Upon his arrival at Great Meadow on or about July 15,
2002, he was scheduled for a psychiatric evaluation on July 26,
2002.  Wurzberger Aff., ¶ 4.  Plaintiff did not appear for his
evaluation and he was rescheduled for the following week.  *Id*.
On July 31, 2002, plaintiff again failed to show up for his
psychiatric evaluation.  *Id*. at ¶ 5.  As this was the second time
he failed to appear, a MHU officer called the housing unit and
plaintiff was reminded of his appointment.  *Id*.  Plaintiff again
chose not to show up, and he was rescheduled for a third time.
*Id*.  On August 9, 2002, Dr. Wurzberger evaluated plaintiff for
the first time.  *Id*. at ¶ 6.  Dr. Wurzberger observed that
plaintiff had multiple somatic complaints and preoccupation with
physical complaints.  *Id*.  His chief complaint was that he was
not being properly treated by the medical staff.  *Id*.  His
records reflected a history of mental health treatment since
1999, with various diagnoses from none to delusional disorder.

-17-

*Id*.  He had been transferred to Great Meadow with a diagnosis of Delusional Disorder, Mixed Type.  *Id*.  Dr. Wurzberger also observed that plaintiff walked with a bizarre gait, which seemed to be a combination of a "pigeon-toed" gait and a post-stroke hemiparesis (shifting randomly from side-to-side).  *Id*. at ¶ 7. It was Dr. Wurzberger's professional opinion that plaintiff's bizarre gait was not due to any physical problem, but he was uncertain whether plaintiff was intentionally feigning his physical problems or whether his complaints were the manifestation of a mental disorder.  *Id*.  Plaintiff's evaluation revealed his speech to be clear and goal directed.  *Id*. at ¶ 8. There were no signs of abnormal psychomotor activity and there were no overt psychotic symptoms.  *Id*.  He denied hallucinations and denied self-harm thoughts, plans or intent.  *Id*.  His cognitive functions were intact and his judgment was adequate as to daily living circumstances.  *Id*.  Plaintiff's main preoccupation was with what he considered to be the right kind of medical treatment, and he was totally consumed by the quest to get surgery and be provided with amenities and services for handicapped inmates.  *Id*. at ¶ 9.

Dr. Wurzberger discussed with plaintiff that he saw no signs or symptoms of major psychiatric illness and that Dr. Wurzberger agreed with the plaintiff that he did not need any psychotropic medications at that time.  *Id*. at ¶ 10.  Just prior

to plaintiff's arrival, he had refused such medication at the previous facility. *Id*. Dr. Wurzberger recommended supportive counseling that would help him deal with his frustrations and feelings of despondency in a more effective manner and obtain a more realistic perspective overall. *Id*.

Following the evaluation and a review of plaintiff's records, Dr. Wurzberger changed his diagnosis to a somatoform disorder, non-specific. *Id*. at ¶ 11. A somatoform disorder is a syndrome where the patient has a history of many physical complaints and is preoccupied with perceived physical ailments despite the lack of medical findings. *Id*. Dr. Wurzberger's treatment was supportive counseling with Ms. Kim at least once a month. *Id*. at ¶ 13. Plaintiff was also scheduled for a follow-up evaluation in one month. *Id*.

One month later, on September 9, 2002, plaintiff was reevaluated by Dr. Wurzberger. *Id*. at ¶ 14. He came into the office with the same bizarre gait. *Id*. He was alert, oriented, coherent and relevant. *Id*. His mood was anxious, affect was modulated. *Id*. There were no signs of abnormal psychomotor activity, and there were no overt psychotic symptoms. *Id*. He denied hallucinations and denied self-harm thoughts or intent. *Id*. His cognitive functions were intact. *Id*. He remained obsessed with the same somatic preoccupations and complaints as well as the perceived lack of response to his medical needs by

-19-

the Medical Department. *Id*. at ¶ 15. Dr. Wurzberger tried to discuss with him some practicable ways to maintain a realistic perspective, but he remained entrenched in his perception of not receiving adequate care. *Id*. As there were no signs of a major psychiatric illness, Dr. Wurzberger continued to recommend supportive counseling services and noted that plaintiff should be re-evaluated as needed. *Id*. at ¶ 16.

Dr. Wurzberger evaluated plaintiff for the last time on November 27, 2002, finding him alert, oriented, coherent, and relevant. *Id*. at ¶ 17. His mood was anxious and his affect was modulated. *Id*. He continued to deny hallucinations and denied self-harm thoughts or intent. *Id*. His cognitive functions were intact. *Id*. As usual, plaintiff had multiple complaints regarding perceived physical ailments and lack of adequate treatment from the medical department. *Id*. at ¶ 18. He was also now preoccupied with the thought of possibly having Hepatitis C and was trying to prove that he incurred the liver damage when treated by his psychiatrist on Rikers Island. *Id*. This quest and struggle seemed to be the main focus of his life and took up most of his time and emotional energy. *Id*. He was eating and sleeping well and, overall he was functioning adequately in his environment. *Id*. at ¶ 19. Dr. Wurzberger again discussed with him the fact that he does not seem to need psychotropic medications at this time, but plaintiff was assured of the

-20-

availability of these medications and encouraged to reconsider
the option of trying some medications if he developed some
physiological symptoms of anxiety or depression.  *Id*.  At no time
did plaintiff present to Dr. Wurzberger any further need for
evaluation or for medication.  *Id*. at ¶ 20.

        Throughout this time, and for the following eight
months, plaintiff also received supportive counseling from Ms.
Kim.  *Id*.; *see also* Kim Decl. ¶¶ 10-11.  Ms. Kim's notes reflect a
stable mental condition.  Wurzberger Aff., ¶ 21; Kim Decl. ¶ 7.
As recommended by Dr. Wurzberger, Ms. Kim provided supportive
counseling once per month.  Wurzberger Aff., Ex. A, pp. 416-23.
Ms. Kim's notes also demonstrate that her observations of
plaintiff revealed that he was stable, not in acute distress and
functioning appropriately in the prison population at Great
Meadow.  Kim Decl., ¶¶ 6 and 7.  After providing proper
supportive counseling for approximately one year, plaintiff's OMH
Level was redesignated as Level 3.  *Id*. at ¶ 10.

        Plaintiff filed his initial complaint on October 16,
2003 (Filing No. 1) and his amended complaint on December 24,
2003 (Filing No. 6).  The amended complaint names twenty-eight
individuals as defendants in both their official and individual
capacities.  All defendants other than defendant Perry filed
their answer on June 2, 2004 (Filing No. 42).  Perry filed his
answer on August 20, 2004 (Filing No. 47).  Defendants filed

their motion for summary judgment on December 9, 2005 (Filing No. 69).  Plaintiff has never filed any response to this motion.

### IV.  Analysis

A careful review of plaintiff's complaint and his deposition testimony fails to evidence any claim as to defendant Campito.  Campito is mentioned in the amended complaint but only as a person stating that plaintiff's finger was swollen (AC, ¶ 11).  This does not state a claim, and defendant Campito is entitled to summary judgment.

### A.   Ignoring Complaints

Plaintiff's claims against defendants Novello, Williams, Paolano, Shimkunas and Vedder are limited to allegations that they ignored his complaints.  It is well settled that ignoring complaints from an inmate fails to establish personal involvement in the alleged constitutional violation.  *Johnson v. Wright*, 234 F. Supp. 2d 352, 363 (2d Cir. 2002).  Therefore, these defendants are entitled to summary judgment.

### B.   Interference With Litigation Claims

Plaintiff alleges denial of access to the courts claims against four defendants.  It is well settled that inmates have a First Amendment right of access to the courts.  *Bounds v. Smith*, 430 U.S. 817, 828 (1977)(modified on other grounds by *Lewis v. Casey*, 518 U.S. 343, 350 (1996)).  To state a claim for denial of access to the courts, a plaintiff must assert non-conclusory

-22-

allegations demonstrating that:  (1) the defendant acted deliberately and maliciously; and (2) that plaintiff suffered an actual injury.  *Lewis*, 518 U.S. at 353; *Howard v. Leonardo*, 845 F. Supp. 943, 946 (N.D.N.Y. 1994).  Plaintiff has not demonstrated either prong in any of his claims.

### 1.    **Deputy Superintendent of Programs David A. Carpenter**

Plaintiff alleges that Carpenter refused him advanced legal copies despite knowing that plaintiff had a court deadline (AC, ¶ 7).  Plaintiff testified that in August 2002, he needed advanced legal copies to respond to interrogatories served upon him in *Renelique v. Holloway*, 01-CV-0601 (N.D.N.Y.).  Renelique Dep. 10:17-12:24.  Plaintiff does not allege that Carpenter acted deliberately and maliciously in denying his request for advance legal copies.  Under DOCS Directive 4833, an inmate can receive advance photocopies for legal documents if he has insufficient funds in his account and the specific document is required by the court.  Plaintiff wanted to make photocopies of 400-500 pages of documents.  *Id*. at 14:24-15:4.  Considering the large number of documents included in plaintiff's request, Carpenter reasonably and in good faith required plaintiff to provide documentation that each specific document was required by the courts.  Thus, defendant Carpenter did not deny plaintiff's request in an effort to prejudice plaintiff's litigation, but rather, to ensure compliance with DOCS Directives.  Carpenter Aff., ¶ 7.

Moreover, a review of the docket in *Renelique v. Holloway*, 01-CV-0601 (N.D.N.Y.) demonstrates that in August 2002, plaintiff requested and was granted an extension until September 19, 2002, to respond to defendants' discovery requests. *See* Docket No. 49. Plaintiff also testified that he was eventually able to pay for photocopies and responded to defendants' discovery requests. Renelique Dep. 14:10-15. Finally, a review of the docket in *Renelique v. Holloway* demonstrates that the action is trial ready. *See* Docket No. 78. Since plaintiff was able to obtain the photocopies and was not injured, he fails to establish a denial of access to courts claim. Accordingly, summary judgment will be granted as to defendant Carpenter both because Carpenter did not act deliberately or maliciously and because plaintiff suffered no injury from the initial denial of free legal copies.

**2.   Defendant Jennifer Rawson, RNC**

Plaintiff alleges that on September 9 and 27, 2002, defendant Rawson refused to provide him with documents that were important to pending litigation in the U.S. District Court for the Southern District of New York (AC, ¶ 15). At his deposition, plaintiff testified that Rawson informed plaintiff that he needed to request copies of his mental health records from the Director of the Mental Health Unit at Great Meadow. Renelique Dep. 17:9-16. Plaintiff further testified that he made such a request and

the Director denied his request.  *Id*. at 17:15-18.  Plaintiff filed a grievance and the records were ultimately turned over to him, and he was able to submit the records to the court.  *Id*. at 17:19-18:3.  The action was still pending as of plaintiff's deposition.  *Id*. at 18:9-10.

Plaintiff fails to state a cause of action against defendant Rawson for two reasons.  First, based upon plaintiff's own testimony, defendant Rawson was not the individual that denied plaintiff access to his mental health records.  Rather, she referred plaintiff to the appropriate official.  Second, plaintiff ultimately gained access to the records and was able to submit them to the court while the action was still pending.  Thus, plaintiff fails to demonstrate actual injury and defendant Rawson is entitled to summary judgment.

### 3.  Defendant Celeste

Plaintiff alleges that on May 8, and May 15, 2003, defendant Celeste refused to open his cell door, preventing him from going to the law library (AC, ¶ 33).  Plaintiff has not identified any injury resulting from his inability to go to the law library.  At the time of plaintiff's deposition, he testified that all the lawsuits he has filed since his incarceration were still pending and that his inability to go to the law library on May 8, 2003, had not resulted in dismissal of any of his actions.  Renelique Dep. 120:14-122:4.  Thus, plaintiff cannot establish

-25-

actual injury.  Therefore, defendant Celeste is entitled to summary judgment.

## C.  Defendant Sally Reams

Plaintiff's only complaint against defendant Sally Reams ("Reams") is that on July 18, 2002, and March 26, 2003, she refused to accept plaintiff's grievance (AC, ¶ 28).  At his deposition, plaintiff quantified his allegation by testifying that Reams refused to accept about 10 to 15 of his grievances.  Renelique Dep. 107:13-15.  Nonetheless, it is well settled that the inmate grievance process is "not required by the Constitution and therefore a violation of such [state process] does not give rise to a claim under § 1983."  *Murray v. Kirkpatrick*, 2007 U.S. Dist. LEXIS 11249, at *6-7 (W.D.N.Y. Feb. 13, 2007)(citing *Cancel v. Goord*, 2001 U.S. Dist. LEXIS 3440, at *9, 2001 WL 303713, at *4 (S.D.N.Y. Mar. 29, 2001).  Thus, even assuming Reams refused to accept plaintiff's grievances, as a matter of law, she did not violate plaintiff's constitutional rights.  Accordingly, Reams is entitled to summary judgment.

## D.  Captain Kelly

Plaintiff's only claim against defendant Captain Kelly alleges that he threatened the plaintiff on May 10, 2003 (AC, ¶ 32).  At his deposition, plaintiff testified that after Captain Kelly learned plaintiff wrote letters to Commissioner Goord and others in Albany regarding events at Great Meadow, Captain Kelly

-26-

called him into his office and told plaintiff that if he was
having problems at Great Meadow, he should first bring them to
Captain Kelly's attention.  Renelique Dep. 112:24-113:19.
Plaintiff further testified that Captain Kelly called him a cry
baby and told plaintiff he did not want people outside Great
Meadow knowing what goes on inside Great Meadow.  *Id.* at 113:20-
114:2.  Accepting these allegations as true and assuming that
Captain Kelly's comments amount to verbal harassment and threats,
such a claim is still not cognizable under § 1983.  *Gill v.
Hoadley*, 261 F. Supp. 2d 113, 129 (N.D.N.Y. 2003)*(citing
Moncrieffe v. Witbeck*, 2000 WL 949457, at *3 (N.D.N.Y. June 29,
2000)(Mordue, J.)(allegations that corrections officer laughed at
inmate not actionable under § 1983); *Carpio v. Walker*, 1997 WL
642543, at *6 (N.D.N.Y. Oct. 15, 1997)(Pooler, J. & DiBianco,
M.J.)("verbal harassment alone, unaccompanied by any injury, no
matter how inappropriate, unprofessional, or reprehensible it
might seem, does not rise to the level of an Eighth Amendment
violation").  Accordingly, Captain Kelly is entitled to summary
judgment.

**E.   Eighth Amendment Claims**

Plaintiff alleges four causes of actions for violations
of the Eighth Amendment.  Specifically, plaintiff alleges that he
was subjected to excessive force on October 17, 2002, and March
14, 2003.  Plaintiff further alleges that he was denied proper

medical treatment by Dr. Silverberg and Dr. Nunez as well as
Physician Assistant Nesmith.  Finally, plaintiff alleges that he
was denied proper treatment for his mental disorder.

1.   **Excessive Force Claim**

An Eighth Amendment claim of cruel and unusual
punishment based on a claim of excessive force consists of two
components:  (1) a subjective component which focuses on the
defendant's motive for his conduct; and (2) an objective
component which focuses on the conduct's effect.  *Sims v. Artuz*,
230 F.3d 14, 20 (2d Cir. 2000).  The objective component of a
constitutional claim of excessive force requires that the
violation be "sufficiently serious by objective standards."
*Griffin v. Crippen*, 193 F.3d 89, 91 (2d Cir. 1999)(internal
quotation marks and citation omitted).  The subjective component
focuses on the wantonness of the defendants.  *Davidson v. Flynn*,
32 F.3d 27, 29 (2d Cir. 1994).  "[I]n the excessive force cases,
the 'wantonness' inquiry turns on 'whether force was applied in a
good-faith effort to maintain or restore discipline, or
maliciously and sadistically to cause harm.'"  *Blyden v. Mancusi*,
186 F.3d 262-63 (2d Cir. 1999).

a.   **October 17, 2002, Excessive Force Allegations**

Plaintiff alleges that on October 17, 2002, defendant
Bundrick, the Nurse Administrator at Great Meadow, kicked him in
the lower back and stepped on his right hand and wrist (AC,

¶ 10).  Plaintiff never made these allegations before filing this action.  It is undisputed that plaintiff was seen by the medical staff on October 17, 2002, for complaints of chest pain. See Bundrick Decl., ¶¶ 3-5; see also Silverberg Aff., Ex. A, pp. 9-10.  It is also undisputed that when plaintiff filed a grievance regarding his medical care on October 17, 2002, he never alleged that he was assaulted by Bundrick.  *See* Holohan Affirm., Ex. B. By not alleging the assault in his grievance, plaintiff has failed to exhaust his administrative remedies.  The exhaustion requirement is a prerequisite to all prisoner claims, even if the remedy requested is not available in an administrative grievance proceeding.  *Porter*, 534 U.S. at 524 (*citing Booth v. Churner*, 532 U.S. 731, 740-41 (2001)).  Thus, the Court will dismiss plaintiff's claim against Bundrick for failure to exhaust his administrative remedies.

        Alternatively, the Court will grant summary judgment for Bundrick because there are no genuine issues of material fact, and no rational juror could find for plaintiff.  *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005)(upholding grant of summary judgment on excessive force claim where plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, such that it will be impossible for a district court to determine whether the jury could reasonably find for plaintiff).  Bundrick treated plaintiff

for an alleged heart attack on October 17, 2002.  Bundrick Decl.,
¶¶ 4, 5; Silverberg Aff., Ex. A, pp. 9-10.  Once plaintiff was
informed he was not having a heart attack, he informed Bundrick
that the real reason he wanted to see the medical staff was
because he wanted a "feed in cell" order.  Bundrick Decl., ¶ 6.
Bundrick informed plaintiff this was not a proper use of
emergency sick call.  *Id*.  Plaintiff then "fell down" and began
shaking violently.  *Id*. at ¶ 7.  This activity ceased with the
application of an ammonia inhalant.  *Id*.  Plaintiff was again
warned about the proper use of emergency sick call and left the
clinic without further incident.  *Id*. at ¶ 9.  Plaintiff
subsequently filed a grievance regarding the medical care he
received.  Holohan Affirm., Ex. B.  Specifically, he complained
that the nurses were laughing at him and that Bundrick refused to
issue him a "feed in cell" order.  *Id*.  Plaintiff did not allege
any use of force in his October 17, 2002, grievance or his
January 2, 2003, appeal.  *Id*.  In addition, just one day later,
on October 18, 2002, plaintiff was seen by the medical staff
complaining of injuries he sustained from a fall.  Silverberg
Aff., Ex. A, p. 10.  Yet, plaintiff never complained about an
assault by Bundrick which he now asserts occurred just the day
before.  In light of the lack of medical evidence and plaintiff's
prior inconsistent statements, no rational juror could find for
plaintiff, thereby providing a second basis upon which to grant

summary judgment for Burdick.  Accordingly, the Court will grant defendants' motion for summary judgment as to this claim.

### b.    March 14, 2003 Excessive Force Allegations

#### 1.    Poirier

Plaintiff's only allegation against CO Poirier is that he falsely accused plaintiff of stealing law library supplies, which lead to the assault and disciplinary proceedings (AC, ¶ 20).  At his deposition, plaintiff testified that Poirier was not involved in the assault.  Renelique Dep. 103:1-5.  Further, the record demonstrates that Poirier was not involved in the disciplinary proceedings.  Thus, even liberally construing the amended complaint, the only claim asserted against CO Poirier is that his allegations resulted in a retaliatory cell search.

A cell search, even a retaliatory cell search, is not actionable under section 1983.  *See Salahuddin v. Mead*, 2002 WL 1968329, at *5 (S.D.N.Y. Aug. 26, 2002)("a cell search is different from the various administrative decisions that are actionable under [§] 1983 if they are retaliatory"); *Walker v. Keyser*, 2001 WL 1160588, at *9 (S.D.N.Y. Oct. 2, 2001)("even retaliatory cell searches are not actionable under § 1983.").  Accordingly, defendant Poirier is entitled to summary judgment.

#### 2.    Weeks, Pomainville, Perry and Wolford

Plaintiff's own statements, or lack thereof, immediately following the alleged assault contradict his

allegations in the amended complaint.  Plaintiff's grievance, testimony at his disciplinary hearing and appeal statement all fail to mention this alleged assault.  Plaintiff's own medical records fail to reveal any complaints to medical staff regarding an alleged assault nor do they reflect the need for any medical treatment for an alleged assault.  It is only after two months had passed that the plaintiff first alleges an assault.  Even that statement is inconsistent with plaintiff's new allegations in the amended complaint because, prior to this lawsuit, plaintiff never alleged that Perry or Wolford were involved with any of the events, let alone with an assault.  Moreover, when the Inspector General's Office investigated the matter, it, too, concluded that plaintiff's allegations were unsubstantiated. Thus, no rational juror could conclude that plaintiff was assaulted.  Accordingly, defendants Weeks, Pomainville, Perry and Wolford are entitled to summary judgment.

### 3.   Armstrong

Plaintiff alleges that Lieutenant Armstrong joined in the "injustice" by finding him guilty of violating prison rules (AC, ¶ 27).  Liberally construing plaintiff's amended complaint, it appears he is attempting to allege a due process violation. Nonetheless, it is well established that time in SHU under thirty days does not implicate a liberty interest.  *Sandin v. Conner*, 515 U.S. 472, 485 (1995); *Bedoya v. Coughlin*, 91 F.3d 349, 351

(2d Cir. 1996).  Plaintiff's four day "time-served" keeplock confinement fails to implicate a sufficient liberty interest to give rise to a due process violation claim.

Even if the four days in keeplock implicated a sufficient liberty interest, plaintiff's due process claim would still fail because he was afforded all of the process due.  The Constitution only guarantees that prison inmates will "not . . . be deprived of a protected liberty interest without due process of law."  *Franco v. Kelly*, 854 F.2d 584, 587 (2d Cir. 1988) (*quoting Freeman v. Rideout*, 808 F.2d 949, 951 (2d Cir. 1986)).  As long as prison officials grant the inmate a hearing and an opportunity to be heard, the "filing of unfounded charges d[oes] not give rise to a per se constitutional violation actionable under section 1983."  *Franco*, 854 F.2d at 587(*quoting Freeman*, 808 F.2d at 953).

The key inquiry, in assessing an allegation that an inmate has been found guilty of false disciplinary charges, is whether or not the prison has provided the inmate with the minimum procedural due process protections guaranteed by the Fourteenth Amendment.  *Id*.  An inmate charged with a violation must be given (1) advance written notice of the charges at least twenty-four hours before the hearing; (2) the opportunity to appear at the hearing, to call witnesses, and to present rebuttal evidence; and (3) a written statement by the factfinders as to

-33-

the evidence relied on for their decision, and the reasons for
the prison committee's action.  *Wolff v. McDonnell*, 418 U.S. 539,
564-66 (1974).

The plaintiff does not make any specific challenge to
his disciplinary hearing.  The record demonstrates that he was
afforded notice and an opportunity to be heard.  The record
further demonstrates that he did not request any witnesses and
was in fact, successful in proving that two of the three items
were actually his.  Finally, he was given a written statement
explaining the basis for hearing officer Armstrong's decision.
Thus, plaintiff was afforded all the process due.  Accordingly,
defendant Armstrong is entitled to summary judgment.

### 4.    Inspector General Roy

Plaintiff alleges that Inspector General Richard Roy
("Roy") failed to investigate the alleged assault upon receipt of
his letter complaint (AC, ¶ 35).  Plaintiff's allegations fail to
state a cause of action because he has no constitutional right to
an investigation, and he has failed to establish the personal
involvement of the Inspector General.

"There is . . . no constitutional right to an
investigation by government officials" . . . "and 'no instance
where the courts have recognized inadequate investigation as
sufficient to state a civil rights claim unless there was another
recognized constitutional right involved.'"  *Lewis v. Gallivan*,

-34-

315 F. Supp. 2d 313, 317 (W.D.N.Y. 2004)(*quoting Stone v. Department of Investigation*, 1992 U.S. Dist. LEXIS 1120, 1992 WL 25202 (S.D.N.Y. Feb. 4, 1992)) and (*quoting Gomez v. Whitney*, 757 F.2d 1005, 1006 (9th Cir. 1985)).  Thus, plaintiff has no cognizable claim alleging that Roy was under an obligation to investigate or prosecute his claims.

Further, to be liable under § 1983, a prison official must have some personal involvement because "[s]upervisor liability in a § 1983 action depends on a showing of some personal responsibility and cannot rest on respondeat superior." *Hernandez*, 341 F.3d at 144.  Plaintiff has failed to establish Roy's personal involvement.  While his letter complaint was received by Roy's office, there is no indication that Roy personally reviewed the complaint or was involved in the investigation.  See Holohan Affirm., Ex. H. In fact, the thorough investigation was completed by Investigator Vacca who concluded that plaintiff's claims of excessive force were unsubstantiated for the same reasons discussed above. *Id*.  Accordingly, defendant Richard Roy is entitled to summary judgment.

**F.  Deliberate Indifference Claims - Medical and Mental Health Needs**

The standard of deliberate indifference includes both subjective and objective components.  "First, the alleged deprivation must be, in objective terms, 'sufficiently serious.'" *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994)(citations

omitted).  Second, the defendant "must act with a sufficiently
culpable state of mind."  *Id*.  An official acts with the
requisite deliberate indifference when that official "knows of
and disregards an excessive risk to inmate health or safety; the
official must both be aware of facts from which the inference
could be drawn that a substantial risk of serious harm exists,
and he must also draw the inference."  *Farmer v. Brennan*, 511
U.S. 825, 837 (1994).  To establish the subjective component,
Harvey must demonstrate that defendants "knew of and disregarded
an excessive risk to [his] health or safety."  *Farmer*, 511 U.S.
at 837.  Prison officials are not liable "if they responded
reasonably to a known risk, even if the harm ultimately was not
averted."  *Id.* at 826; *see also Estelle v. Gamble*, 429 U.S. 97,
106-7 (1976)(prisoner not entitled to treatment by every medical
alternative as long as treatment is reasonable).

     Negligence or medical malpractice is insufficient to
support a claim of deliberate indifference.  *See Hendricks v.
Coughlin*, 942 F.2d 109, 113; *see also Estelle*, 429 U.S. at
105-06.  Moreover, mere differences of opinion regarding medical
treatment do not give rise to an Eighth Amendment violation.
*Estelle*, 429 U.S. at 107.  Thus, to the extent the plaintiff
contests the diagnosis and treatment that he received, he does
not state a valid claim of medical mistreatment under the Eighth
Amendment.

At issue is whether the plaintiff's medical conditions are, as a matter of law, sufficiently serious to give rise to an Eighth Amendment claim.  To survive a motion for summary judgment, the plaintiff must "come forward with 'specific facts showing that there is a genuine issue for trial.'"  Matsushita Elec. Indus. Co., 475 U.S. at 587 (*quoting* Fed. R. Civ. P. 56(e)).  The plaintiff has alleged that defendants were deliberately indifferent to his well being as evidenced by the treatment afforded to him for his medical and mental health needs.

Not all claims regarding improper medical care are constitutionally cognizable.  The standard for Eighth Amendment violations contemplates "a condition of urgency" that may result in "degeneration" or "extreme pain."  *Hathaway*, 37 F.3d at 66 (*quoting Nance v. Kelly*, 912 F.2d 605, 607 (2d Cir. 1990)(Pratt, J., dissenting)).  "A prisoner who nicks himself shaving obviously does not have a constitutional right to cosmetic surgery.  But if prison officials deliberately ignore the fact that a prisoner has a five-inch gash on his cheek that is becoming infected, the failure to provide appropriate treatment might well violate the Eighth Amendment."  *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998).  Similar distinctions may be drawn with respect to other medical conditions.

In an Eighth Amendment claim premised on the inadequacy of medical care provided to an inmate, the inmate must establish that the health care provider acted with deliberate indifference to a serious medical need of the inmate. *West v. Atkins*, 487 U.S. 42, 46 (1988); *Estelle,* 429 U.S. at 106-07; *Chance*, 143 F. 3d at 702.

Plaintiff alleges that Doctors Silverberg and Nunez and Physician Assistant Nesmith were deliberately indifferent to his medical needs. Plaintiff must demonstrate that defendants Silverberg, Nunez and Nesmith were deliberately indifferent to a serious medical need. The "sufficiently serious" requirement "contemplates a condition of urgency, one that may produce death, degeneration, or extreme pain." *Hathaway*, 37 F.3d at 66 (quotation marks and citation omitted). For purposes of this motion, defendants concede that plaintiff meets this standard with respect to his Hepatitis C. However, with respect to all other allegations of medical need, plaintiff cannot establish that they actually existed and/or that they are sufficiently serious. It is evident that neither indigestion or dry skin are sufficiently serious to constitute a claim of cruel and unusual punishment. With respect to plaintiff's alleged physical ailments regarding his bizarre gait, head, neck and spine injuries and a lump on his abdomen, there is no medical evidence establishing their existence beyond plaintiff's complaints. In

-38-

fact, Magistrate Judge Treece recently ruled that plaintiff "is indeed preoccupied with the existence of medical conditions, of which this Court has not received any evidence documenting." *Renelique v. David*, Case No. 9:03CV1145, p. 37 (9/30/05).  With respect to plaintiff's back pain, plaintiff fails to allege that it was sufficiently severe.  Thus, plaintiff fails to establish that he suffered from these ailments, let alone that defendants knew he suffered from them.  *Lewis v. McGraw*, 2005 WL 3050306, at *8 (S.D.N.Y. 2005).  Therefore, he cannot establish the first prong of an Eighth Amendment claim.

        To the extent plaintiff could satisfy the first prong of an Eighth Amendment claim, especially with respect to his Hepatitis C, he cannot establish deliberate indifference.  With respect to his Hepatitis C, both Dr. Silverberg and Dr. Nunez noted that the disease was mild and did not require any immediate treatment.  It was the doctors' independent medical judgments that the disease be monitored.  Plaintiff's disagreement with this course of treatment does not constitute deliberate indifference.  *Chance*, 143 F.3d at 703.  With respect to plaintiff's lower back pain, even if he could demonstrate that it was sufficiently serious, Dr. Silverberg treated the back pain by issuing a back brace.  Finally, plaintiff's main complaint against PA Nesmith is that if PA Nesmith had examined him in another position, he would have discovered the lump on his

abdomen.  This allegation, at most, states a claim for medical
malpractice.  It is well settled that a claim of malpractice is
insufficient to constitute deliberate indifference.  *Id.*
Accordingly, defendants Silverberg, Nunez and Nesmith are
entitled to summary judgment.

### 3.    **Plaintiff's Mental Health Treatment was Proper**

Plaintiff alleges that he was denied proper mental
health treatment while at Great Meadow in violation of the Eighth
Amendment.  "Undoubtedly, there are situations where a
psychiatric condition can pose a risk of serious harm."  *R.T. v.
Gross*, 298 F. Supp. 2d 289, 297 (N.D.N.Y. 2003 (*citing Cuoco v.
Moritsugu*, 222 F.3d 99, 106 (2d Cir. 2000).  It is undisputed
that plaintiff suffers from a psychiatric illness.  See
Wurzberger Aff., ¶ 11.  He was diagnosed at Great Meadow with a
somatoform disorder, non-specific.  *Id*.  Plaintiff's condition
while at Great Meadow was stable and not sufficiently serious to
trigger the Eighth Amendment.  In addition, plaintiff was
properly treated and cannot demonstrate any deliberate
indifference by defendants Dr. Wurzberger and Ms. Kim.

After reviewing plaintiff's mental health records, no
rational juror could conclude that the Eighth Amendment was
violated.  All plaintiff alleges is that he should have been
provided more supportive counseling and that Ms. Kim did not see
him when she was on vacation.  The record clearly demonstrates

that even if Ms. Kim took a vacation, she still provided the recommended once-a-month supportive counseling.  See Wurzberger Aff., Ex. A., pp. 416-23.  Moreover, plaintiff fails to provide any evidence that he suffered any acute episodes as a result of a lack of supportive counseling.  Plaintiff cannot demonstrate that he suffered any acute episodes while at Great Meadow.  Therefore, he cannot establish that his psychiatric condition was sufficiently severe.  *R.T.*, 298 F. Supp. 2d at 297.

In any event, plaintiff cannot demonstrate that defendants were deliberately indifferent to his psychiatric needs.  The evidence in the record is that neither Dr. Wurzberger nor Ms. Kim ignored or otherwise callously disregarded plaintiff's condition.  Dr. Wurzberger observed plaintiff on three occasions.  At no time did Dr. Wurzberger believe plaintiff to be in acute distress or in need of even any psychotropic medications.  Wurzberger Aff., ¶¶ 8, 10.  In addition, plaintiff expressed a desire not to take any medications.  *Id.* at ¶ 10.  Similarly, Ms. Kim provided supportive counseling once a month.  *Id.* at Ex. A, pp. 216-23.  All of Ms. Kim's observations noted that plaintiff was doing well and not in acute distress.  Id.; see also Kim Decl., ¶ 7.  Plaintiff's chief complaint to Ms. Kim was a desire to be single bunked and to be eligible for a transfer out of Great Meadow.  Kim Decl., ¶¶ 9, 10.  Ms. Kim requested a single cell for plaintiff and was successful in

-41-

working with plaintiff to further stabilize his mental health, making him eligible for a transfer out of Great Meadow.  *Id*. Thus, no reasonable juror could conclude that defendants were deliberately indifferent to plaintiff's psychiatric needs. Accordingly, defendants Wurzberger and Kim are entitled to summary judgment.

**G.   A.D.A. Claims**

In liberally construing plaintiff's amended complaint, it appears he contends that he is disabled insofar as he is limited in the major life activity of walking.  He further claims that his amended complaint explicitly names defendants Duncan and Plescia in the claim for damages under the ADA.  Plaintiff does not specify whether he seeks relief under Title I or II of the ADA.  However, inasmuch as Title I prohibits discrimination in employment and plaintiff was not defendants' employee, it is assumed that plaintiff brings this claim under Title II.

Plaintiff alleges that defendants Duncan and Pleascia[1] violated the Americans with Disabilities Act ("ADA") by keeping him in a facility that has stairs.  Plaintiff alleges that his inability to climb stairs prevented him from attending the mess hall and the law library.  Plaintiff also alleges that defendant Maguire, despite knowing of his walking impairments, ordered him

to the mess hall (AC, ¶¶ 18-19).  As a result of this order,
plaintiff alleges that he fell down the stairs (AC, ¶ 19).

**Subject Matter Jurisdiction**

        The Supreme Court has held that suits in federal court
to recover money damages from a state for failure to comply with
Title I of the ADA are barred by the Eleventh Amendment.  *Board
of Trustees v. Garrett*, 531 U.S. 356, 374, n. 9 (2001).  The
Court found that any abrogation of Eleventh Amendment immunity
that Congress may have intended was an invalid exercise of power
under § 5 of the Fourteenth Amendment because the legislation was
not congruent and proportional to the injury.  The Second Circuit
has held that a private suit for money damages under Title II of
the ADA may not be maintained against state officials acting in
their individual capacities.  *Garcia v. SUNY Health Sciences
Center of Brooklyn,* 280 F.3d 98, 107 (2d Cir. 2001).  Thus, the
ADA claims against defendants Duncan, Plescia and Maguire in
their individual capacities should be dismissed.

        To the extent plaintiff names defendants Duncan,
Plescia and Maguire in their official capacity, post-*Garcia*
district courts have held that individuals cannot be named in
their official capacity either, noting that public entities
could, and should, be sued directly.  *Carrasquillo v.
City of New York*, 324 F. Supp. 2d 428, 441 (S.D.N.Y. 2004)
(citations omitted).  In any event, the allegations set forth in

-43-

the complaint with respect to the ADA claim are devoid of any claim that the individual defendants' actions were motivated by any such discriminatory animus or ill will due to plaintiff's alleged disability. *Garcia*, 280 F.3d at 111-12. Thus, defendants Duncan, Plescia and Maguire are entitled to summary judgment.

The record demonstrates that plaintiff's alleged limitations are not substantial. Other judges in this district have already concluded that plaintiff's litany of alleged physical ailments do not necessarily constitute a "disability." *See Renelique v. Goord*, No. 9:03-CV-525, Filing No. 80, p. 37 (Mag. Judge DiBianco Sept. 19, 2005)(attached as Exhibit L to Holohan Affirm). Magistrate Judge Treece reached the same conclusion. *See Renelique v. David*, No. 9:03-CV-1145, (Filing No. 70), p. 47 (Sept. 30, 2005)(attached as Exhibit M to Holohan Affirm.). These legal conclusions are supported by the medical records. In fact, the medical personnel at Great Meadow informed the Superintendent that there was no organic reason for plaintiff's bizarre gait and that his walking "problems" were the manifestation of his delusional disorder. See Holohan Affirm., Ex. D. Plaintiff cannot demonstrate that he is disabled under the ADA. Therefore, defendants' motion for summary judgment will be granted as to defendants Duncan, Plescia and McGuire.

Having addressed all of plaintiff's claims and having found that summary judgment is proper as to all defendants, the Court will grant defendants' motion for summary judgment.  A separate order will be entered in accordance with the memorandum opinion.

DATED this 12th day of April, 2007.

BY THE COURT:

/s/ Lyle E. Strom

_____
LYLE E. STROM, Senior Judge
United States District Court